Second case of the day is Angelex v. United States or Angelex et al. v. United States et al. The appellant is represented by Mr. Leder. Be pleased to hear from you, sir. Are you with the Justice Department? Yes, I am, Your Honor, with the Justice Department Civil Division. With me here today is Mr. Michael DeLauro, who is the Lead Trial Counsel for the government in this case. He also is with the Justice Department with the Aviation and Admiralty Section. You're with the Civil Division appellant? I am, Your Honor. I'm the Director of the Civil Division. Very good. Good to have you. Welcome to West Virginia. Thank you very much. And to Greenbrier County. I like this part of West Virginia very much. Mr. DeLauro and I were just talking about some wonderful whitewater rafting that we've done over the years in this area. We've got a beautiful state. And also with us is Commander John Luce, the United Thank you. Go right ahead. The United States urges that this court reverse the decision by the District Court and dismiss this case. I wanted to start out by emphasizing the importance of this appeal to the United States, because this case goes to the very heart of the practical ability of the United States to carry out our international and domestic law obligations in fighting this very preventable form of illegal pollution of the seas, of ships dumping large quantities of oil and oily water in the oceans. This crime is very difficult to do in a practical scheme to allow the government to go after this type of crime in a very special situation when we have foreign ships that come into U.S. ports, commit crimes here, and then, as one would expect, seek to depart as quickly as possible in order to be on their way for another voyage. And so obviously this raises very interesting issues because you have foreign ships, foreign crews committing crimes here, but then seeking to depart as quickly as possible. This is a Maltese ship? Let's see. I believe it is a Maltese ship. I think it's a Liberian company. Liberian company? Right. Maltese ship. And the company is headquarters, I believe, headquartered in Greece. Headquartered in Greece. Right. So we have a, and as you'll hear me talk about today, we have two major concerns because there is an owner, which is Angelex, but Angelex only owns this ship. One of our primary concerns here is over Cassian. Cassian is the operator of this ship. Cassian has a fleet of eight ships. And our understanding is each one is like Angelex. It's their companies. Each company only owns one ship. Each company owns one ship. Cassian runs them all. Exactly, Your Honor. And it came into Norfolk and is still in Norfolk. That's correct. Came into Norfolk in mid-April. It's still down there loaded with coal. Correct, Your Honor. It wants to go to Brazil. That's correct. And the Coast Guard says you have to post bond and fix conditions, right? Well, the Coast Guard says, the Coast Guard obtained an order that says the Papadakis, that's the name of the ship, cannot depart from Norfolk. Obviously, one of the conditions, although it's not part of this case at all, is before the Papadakis could depart, it has to fix the anti-pollution equipment. I mean, there's this situation. Right. It had environmental problems, but was the bond actually fixed? No, Your Honor. The bond was never fixed. Correct. That's correct, Your Honor. So the terms of the bond, how would they know what they had to do then? The terms of the bond never fixed. The United States Coast Guard proposed, entered into negotiations for a bond. And this is very standard operating procedure. What happens is a ship enters a US port, commits one of these crimes, and the Coast Guard then obtains an order that says the ship cannot depart. I have a two-part question for you. Yes, Your Honor. Number one, under what circumstances could a district court, or this court for that matter, ever review a Coast Guard decision? And secondly, at least the appellates make this argument that it was more than a proposal. It was a take-it-or-leave-it offer to post a certain amount of bond. Now, which leads back to the first question. When is that reviewable? If it's a take-it-or-leave-it offer? Your Honor, it is not reviewable. And if we focus specifically on the wording of the statute, as you know, the briefs discuss it, Great Lane 33 U.S.C. 1908E. And what that statute says, and so much of our case here, both jurisdictional and on the merits, is focused on the plain language of that statute. It gives a discretion, but I thought you were going to say that you all, your clients, had fixed a bond. That it was $2.5 million plus X conditions. Ten other conditions. And that was the bond. And you tell me there was never a bond fixed. The only entity that actually fixed a bond, Your Honor, is the district court, which had no authority to do that. Well, right, the court fixed the bond, it was different. But I thought you had fixed a bond that was $2.5 million. No, Your Honor, we didn't fix it. Well, you first fixed one at $3 million, and then you came in and reduced it to 2.5. Your Honor, we were in negotiations. Why are there negotiations at all if whatever you do is not reviewable? Why would you negotiate at all if the Coast Guard can do what it wants without oversight or review by anyone? Why is there negotiation? Because, Your Honor, it's very much, we have no desire to have ships just sitting in our ports. That's not the purpose here. Well, what terms can they leave? We, the standard operating procedure is we engage in negotiations with the ship owners and operators. All right, and you don't come to an agreement. There's a stopping point. Here you had a stopping point at $2.5 million plus conditions. That was your take-it-or-leave-it offer, Judge Floyd said. If they post the $2.5 million plus satisfy those conditions, they can leave, can't they? Yes, Your Honor. Well, then the bond was fixed. I mean, Your Honor, I mean, Jack comes in here in the courtroom and the circuit judge sets a bond of $100,000, and he says, I can't afford it. And he said, well, that's the best we're going to be able to do. If he comes back tomorrow with $100,000, he can leave, right? Two points, Your Honor. He can post it. Two points, Your Honor, if I may. I may have misunderstood your, when you used the term fixed. I understood that. That's a slang term from West Virginia, maybe. But I thought there was a bond. I thought we had a bond. Absolutely fixed. And they didn't like it, and the district judge didn't like it, and he reduced it. He fixed a different bond, is what I call it. He fixed a lesser bond. Correct. And you didn't like that one, and so you took an appeal. Your Honor, we didn't take an appeal from him fixing a bond. Remember, he ordered us to. You took an appeal from all the whole thing. Him fixing a bond and ordered you to either indict or file civil proceedings by the next day and a bunch of other things. Well, no, the key thing for this civil case, we did later indict for this case. No, but he ordered that you do something by the next day, or you couldn't indict. No, Your Honor, he never ordered we could not indict. Well, he did, too. I can read English. Your Honor, what he ordered, what this civil case is about is he ordered us to let the ship depart after posting the bond. As a condition of said bond, they submit to the jurisdiction of the Coast Guard for either a civil penalty proceeding or criminal proceeding, if such proceedings are instant material. Only one or the other of said proceedings shall be utilized by the respondents. That's you, either a civil penalty hearing or a criminal action, one or the other. If you have a civil penalty hearing, you can't indict. That's what that order says. And that's obviously, that's totally against the law. That's what it says. That's the order on appeal, that we stayed that order, but you had been ordered not to do both. You couldn't do both. You couldn't have a civil penalty for dumping the bilge water into the port of Norfolk, and you could not indict somebody. You couldn't institute a criminal proceeding, either. You couldn't do both. You could do one or the other. Right, but, and Your Honor, that, I will explain. That part of the order is absolutely, clearly wrong, and Mr. Chalmers... Sure, it's absolutely, clearly wrong, but that's the order that you appealed, and you've said that it's clearly wrong. Right, but that's the, in a way, that's the least of our concerns. Well, I know it wasn't much, but it telegraphs that there's something amiss here. Yes, very much so. I've never heard of a district judge enjoining a grand jury proceeding. Right, Your Honor, as I say, that, I can't... Since we stayed this order, you've returned, the grand jury in Norfolk has returned an indictment. Yes, Your Honor, and indeed, if we feel that we indicted the ship, the owner, Angelides, and Cassian, the operator, and if we feel after the indictment, and after the criminal proceedings, and after there's a conviction, if we nevertheless feel we can proceed civilly as well, under the law, we can clearly do that. You can obviously ask my friend here, Mr. Chalmers, but I don't think he's defending that part of the judgment at all. Well, there's some, you may have answered my question early on, but they claim that that two and a half million dollars was bankrupt. If they were, if it were a criminal case, and that allegation was made, a judge would have to review that and determine whether they can pay it or not. If that, if it's true it was bankrupt, isn't that a constitutional violation? It is not, Your Honor, but you've gotten, I think, to the heart of the controversy here. Remember, what the judge said, what Judge Dumas said is, he wants to, he said he would impose a 1.5 million dollar bond on Angelides. What we have been talking about all along, we said, no, no, no, no. We have an owner, and we have an operator. What about Cassian? Cassian, who is, by the way, a repeat offender. He had a prior record, he didn't join in this emergency petition. The Cassian didn't sue here, but Cassian is in charge, and so we said, no, no, no. It may be, we're not convinced that Angelides can't afford a 2.5 million dollar bond. We wanted, and Judge King, if I may, this partly goes to what you were asking before, we're happy to keep negotiating. As far as we're concerned, this is not a situation of, oh no, this is totally over. We are willing to keep negotiating and talking, if Mr. Chalice, on behalf of his clients, wants to keep talking. But Judge Floyd, I'm sorry, I'm not getting right to it. Getting right to it is, what about Cassian? Right, that's the point of my question. So you think there are additional assets there beyond the 2.5? Right. We said, give us information about Cassian, and for quite a while we didn't get any. Then we got incomplete information. We got information, as I recall, a fair amount of it in Greek. But we don't have information that we can check or audit, etc. We're not done. The Coast Guard said, we want to do more talking, we want to investigate this further, because we are not at all convinced that 2.5 is not enough. Now, the 2.5, the companies cannot come up with 2.5. And remember, Mr. Chalice and his client made many threats. It'll bankrupt us. We'll just leave you the ship. And obviously, these struck a chord with Judge Dumas. But remember, Cassian operates eight ships, eight vessels. Are all these similar ships? And they're coal haulers or oil tankers? What are they? All cargo ships, yes, in varying sizes, Your Honor. And they operate internationally. And so Cassian clearly wants to keep talking. Is this West Virginia coal they're hauling out of? It might be Virginia coal. You should have anticipated that question, didn't you? We need that coal hauled off to China and New Zealand. I think South America. It might have been Virginia coal. I'm not certain. So what we have said is, we're willing to keep negotiating. We're willing to keep talking. But in any event, there's no jurisdiction, no court has ever done what Judge Dumas did here. There is no court that has come in and judicially reviewed the Coast Guard while it's negotiating a surety bond like this in order to exercise its discretion. Because remember, the key here is, the statute says the Coast Guard shall obtain an order that prevents the ship from leaving. That makes perfect sense, right? And who issues that order? The Customs? Well, it's actually Customs and Border Patrol issues it at the end. They issue the order. The Coast Guard obtains it. Makes the decision. And by the way, they both report to the same Secretary. They both are in the Homeland Security. Precisely, Your Honor. That's exactly right. So when the statute says Secretary, it refers to the Secretary of Homeland Security. Exactly, Your Honor. Exactly. But the Coast Guard's the most active agency involved here. Yes, Your Honor. Exactly. So the Coast Guard does as the statute says. The statute says the shall deny clearance. Coast Guard does that. Now, and this is when the key is. The Coast Guard, the statute says, the Coast Guard actually says the Secretary. But for these purposes, it's the Coast Guard. If there's a bond that is satisfactory to the Secretary, then the ship can be released. And that's what happens almost all of the time. I've quizzed the Coast Guard folks. And they tell me it's very rare on one or two occasions we're actually left with the ship. But this just doesn't happen very often. So what we want to do, instead of having the ship just sit there in the port at Norfolk, we want to talk realistically to the owner and the operator and say, what can we work out? And so, Judge Thacker, you said, why bother? Well, we don't want these ships hanging around. As long as the crew is taken care of. That's one of the most key parts of this. And especially the crew members who we need for the criminal prosecution. We want your witnesses. Exactly, Your Honor. And here, note, the reason we have so much good evidence is that, fortunately, one of the crew was a whistleblower. And he provided us not just information, but photographs to show what we call magic pipe, the way that Cassian and Angelike get around the pollution control devices. The question burned me a little bit in this case. When the secretary says, that's it, where do they go? They can, under the statute, which is at 33 U.S.C. 1904 B, I think it is. Not, sorry, 1904 G. They can go to, they have administrative mechanism. They can go to the secretary and seek an administrative appeal. And, and this is absolutely key in part for your question before about the Constitution. In 1904 H, they can bring, they can seek compensation for the loss of damage. So Congress thought about this. Congress provided, I'll quote for just a moment, it's not long. A ship unreasonably detained or delayed by the secretary, acting under the authority of this chapter, is entitled to compensation for any loss or damage suffered thereby. So if for some reason, forget all this, this terrific evidence that we have that is the basis of the indictment, let's say that, that didn't exist or, you know, the secretary acted wrongly here, the ship can get compensation. So, and remember, we really are here only talking about money. We're not talking about, you know, Mr. Chalice has briefed this with constitutional. You know what that red light means over? I, I see that, Your Honor. I'm here to answer your question. So I'll sit down if, if. No, just want to see if. Well, I do have one more question. All right. Let's say, from whom, who supervises the award of damages? Is it a court or somebody else? Who supervises? Who supervise, who makes the decision what the, say they're entitled to damages. Who makes that decision? They're entitled to compensation. Yes, that would be an action in court, Your Honor, that would later, let's say in the Cassian and Angelix are acquitted in the criminal proceedings. They could sue in the district court down Norfolk? They could sue. I'm not sure what the proper venue is. I assume it would be Norfolk. They could sue saying that the ship had been unreasonably detained or delayed by the secretary and then seek compensation. Again, I'm here to answer your questions. Otherwise, I'll, I'll say for rebuttal. Thank you, Your Honor. Thank you very much, sir. Mr. Chalice, did I pronounce that wrong or right? George Chalice. George Chalice. Yes, sir. Good to have you here, sir. Thank you, Your Honor. It pleases the court. I'm here on behalf of the Appalese, which is Angelix Limited, a Maltese company that flies the Maltese flag. The company is Maltese. The ship flies the Maltese flag. And also, we're here on behalf of the vessel, In Rim. The ethos of the government's argument was heard in the first 30 seconds. We need the right to bludgeon third parties and we want you to sprinkle holy water on it because the law doesn't give us the right to do it. That's the ethos of the government's argument. Here, we tried to negotiate for the release of the vessel. The government gave us an ultimately a take-it-or-leave-it position. We went to court. During the middle of the court hearing, Judge Dumas, after pushing both sides hard during the hearing, recessed so the parties couldn't negotiate. An agreement was concluded in principle, subject to Coast Guard headquarters confirmation.  That was what I always understood, right? And there weren't any further negotiations either, right? There's been no further negotiations. I haven't heard from the Coast Guard or lawyers. So there's been no agreement. And so the bond is what they said is. It's $2.5 million plus 10 other conditions. That's correct, including the waiver of significant defense. And that is a matter within the discretion of the Secretary here, the Coast Guard. And that's what the law says. And you've got a real reviewability problem here under Heckler. And there's a case in the Fourth Circuit that Judge Dumas wrote, a Larson case that says reviewability means jurisdiction. That's correct. Which means that you really, you know, how's the district court got jurisdiction to get into this thing? This is something for the Coast Guard. We can't be running, the courts can't get into running who gets to leave port and when and what the bonds are for ships down there. Well, Judge, the way the district court analyzed the issue, we believe is the appropriate way and I'll explain why. And then entered an injunction saying they couldn't prosecute if they decided to do simple penalties. You can't, how could the court do that? How'd you let him do that? That was your order that you got, enjoining the government from civil penalties or criminal prosecution. They had to pick and choose immediately and they couldn't do both. Well, I think the purpose of the statute, Your Honor, is clear that if the government elects in its discretion to pursue a criminal case, that they don't have the ability to go after the same party civilly. That would be a double dip. That they can either go criminally. They can get civil penalties from the people that have all the money and they can get, they can prosecute somebody individual criminally and put them in the penitentiary. Well, that's right. But that includes penalties. They can put the individuals in the jailhouse for dumping that stuff into harbor. I don't believe that. But you can't, the district court can't get involved, can't enjoin a federal grand jury or the United States attorney from seeking an indictment or issuing a criminal complaint or say that there's a statute of limitations maybe, five years or something. But that's by operation of the law. Congress is taking care of that. I don't believe Judge Dumas did. Well, that's what it says. The order says that. Only one or the other of said proceedings shall be utilized. Either a civil penalty hearing or a criminal action. That's on page two of the order of May 8, 2013. Right. And I believe that tracks the actual language of the act to prevent pollution from ship that says that if there is a violation of a civil, sorry, if there's a civil violation or a criminal violation that then they can proceed. If you read the actual context of 1908A and 1908B, Judge Dumas' language tracks exactly what the statute says. So I would agree with the court that Judge Dumas can't enjoin the grand jury from proceeding. But if you read the statutory entitlement that if the government elects to prosecute a party criminally, they don't get a second bite at the apple against the same party civilly. Here's our problem. We have a precedent in this circuit called speed mining, which cites to Heckler with the United States Supreme Court case. And it has this proposition in it. Judicial review cannot occur when a statute provides no judicially manageable standards for judging how and when an agency should exercise its discretion. And that's problematic here. Because this is a generally written statute with no, it doesn't tell a court how it should proceed. What do you do with that? Well, I think Judge Dumas did the right thing. What he said was that there is a judicially manageable standard and that's due process. And he cited the Fourth Circuit precedent for that exact proposition. And what he said was here, this was the worst abomination of due process that he's seen in over 30 years as a federal judge. And so what he looked at here is initially the question that you're talking about. How does he have the authority to look at what the Coast Guard's done? And he looked at the question of subject matter jurisdiction. And he looked at two separate issues. And I'll take them in inverse order. First, he looked at whether the case comes before him as an admiralty matter. And the U.S. Supreme Court in Norfolk Southern Railway versus Kirby said that the concept of maritime jurisdiction first is expanding and it's conceptual, not spatial. And there's a case out of the Fourth Circuit involving Carnival Cruise Lines which says the court has to look to the nature of the dispute and decide whether it is sufficiently salty or not. And here, remember, we're talking about a ship. A case where crew members from the ship are accused of falsifying records while in the Eastern District of Virginia. Records that the Coast Guard routinely review. So there's no more salty case than the case that we're talking about. And if you adopt Judge Dumas' position that he had the subject matter jurisdiction under admiralty jurisdiction, the court really need not go much further in affirming him because the standard of review would then be an abuse of discretion. And the government's offered no argument how Judge Dumas supposedly abused his discretion in setting the terms of the bond. Because the discretion is left to the Coast Guard as to what to do here. How do you get around our Fourth Circuit precedent in Larson and speed mining that Judge Floyd was referencing, that there are no manageable standards in this statute to give the court guidance? The discretion rests with the Coast Guard, doesn't it? We're not experts in just, I mean, federal judges generally aren't experts in how you run a court. Just like we're not experts in how you run a coal mine. I mean, if we start, like under speed mining, if we start reviewing citations issued to coal mines, the coal companies aren't going to wait till, or deal with the administrative proceedings, they're going to come to the district court and get them to review whether the mine inspectors were abusing their discretion. That would be, that's the proposition that you have when you get in to compare this to the speed mining case. And there we said you can't do it. But the second jurisdictional hook that Judge Dumas looked at was first whether there was final agency action, which he found. And then he also looked at various other exceptions. And he took the... Well, you got all these administrative procedures that you all just bypassed. Because you had administrative appeals all the way within the Department of Homeland Security and you bypassed them all. Well, that's not quite right, Judge. Because there was a final agency action. I mean, you brought a lawsuit. You brought a lawsuit. And then they negotiated with you after you brought the lawsuit. But you brought a lawsuit before you dealt with anything. No, sir. There was no final agency action. They set the bond and they told you it was negotiable. That is factually incorrect, Judge King. The negotiation occurred... And they have the right, the power, the obligation to fix the bond. That's right. Not this court. They're not a district court. It's committed to the agency by statute. I understand... In which case, these other issues you never get to. Well, I don't think that's correct and I'll explain why. I understand that... These are some things we got to let, we got to just trust people to do. And here we got the experts, the experts for the United States government. There's the United States Coast Guard. But the Coast Guard's not an expert. I mean, they know a lot more about it than any of the three of us. Just a second, Judge. Yes, the Coast Guard is not expert in statutory construction. And that's where... They're experts on how to run the port. And they're experts on what they need to run the port. Now, and which is kind of what we're dealing with here. We're not. Well, they're experts on when they want to refer something to the Justice Department and seek prosecution. They're experts on when they want to cite somebody for a civil penalty. They have that obligation and they can do them both. But they can do them both under the statute. And you aren't allowed to go to court and get it stopped because it's non-reviewable. But that's the point. It is reviewable because... Well, that's what we're here to talk about, I guess. If you look at the statutes that this court and other courts have looked at and found give an agency non-reviewable discretion, they include much stronger language such as this is not reviewable by anyone or any other tribunal, district court or otherwise. Here, this is analogous to the Clean Water Act. And the Supreme Court in Sackett, which was decided not that long ago, said, wait a minute, this is crazy. You can't have a situation where you get a grieved party stuck in this murky water... How is it analogous to the Clean Water Act? Just because it deals with water? Because it's a pollution prevention statute. Okay, the statute here says, clearance may be granted upon the filing of a bond or other security satisfactory to the secretary. How does that not vest discretion in the secretary? And how are we to determine what is satisfactory to the secretary? Well, they've now proceeded here in this case with an indictment. They've been indicted on three potential APPS violations. The maximum APPS fine is $1.5 million. They demanded $2.5 million. So how can that be a reasonable exercise of discretion when they're talking about a multiple of the maximum fine? Because it's got to satisfy the secretary. Not satisfy some district court who wants to look over the secretary's shoulder. Right. Or some court of appeals that wants to look over somebody's shoulder. You've got to be satisfactory to the secretary. Is it $1.5 million per count so that there are three counts and it would be $4.5 million? No, Your Honor. It's up to $500,000 per count is the maximum final penalty. Now, what you have here, though, if following the government's logic to this illogical conclusion, they can condition the release of the vessel on a guilty plea. We're not going to let the ship go. Why? Because you haven't pled guilty yet. I mean, you can't have an agency. The agency doesn't control whether there's a guilty plea or not. I mean, the Attorney General of the United States, the United States Attorney is the one that handles that. They've referred the matter from the Department of Homeland Security to the Department of Justice for the criminal prosecution. That was enjoined by this order, but that's a matter for the Department of Justice and for the court for the criminal case. Well, but what if... That's distinct from this thing. But, Your Honor, it's not distinct. Well, it is distinct. If you're saying that the Coast Guard has unfettered discretionary authority to dictate the terms by which the ship gets released... But the prosecution is dictated by the prosecutor and the grand jury. They're the ones that decided to get an indictment, not the Coast Guard. Well, in this matter, Judge Dumar was well aware of the reviewability issue, and subject matter jurisdiction was a large part of both the briefing and the argument. And in addition to advocacy jurisdiction, he also found that there was final agency action... Well, advocacy jurisdiction, you'd have to have an arrest of the ship. There's been no arrest of the ship. The ship could... You post that $2.5 million and satisfy the conditions of the bond, as I understand it, from Mr. Letter, and head off to Brazil. Well, actually, that's not correct. You don't need to have an arrest to invoke the court's advocacy jurisdiction. You can have advocacy claims that arise in many shapes, sizes, and forms. You can have steaming claims. You can have cargo claims. It's not predicated upon the court's NRAM or quasi-NRAM jurisdiction. Those are subsets of the court's much broader advocacy jurisdiction. Well, the way this statute is written, and it's very general, it's not even reviewable under the APA. It does give you a remedy at the end of the day. That is, you can seek damages for wrongful actions taken by the Coast Guard and by the Secretary. But who do you review it to? And this is the problem, and this is what Judge Dumar focused on. Well, that's why we're here today. We're having heartburn with whether he can review it or not. Well, if you look at the five exceptions that are set out to the exhaustion of administrative remedies... But it's not even subject to APA review. This statute is not subject to APA review. Well, our position is that absent a clear and convincing evidence of that, it is subject to APA review. And the district court always retains jurisdiction for matters such as statutory construction and violations of due process. And we cited the Fourth Circuit authority in our briefs on those points. And the question really before the district court was whether the agency exceeded its legal authority. And when you look at that sentence in 1908E, which says that the Secretary can demand a bond or other surety, our position is when you look to the legislative history, it's quite clear that that section is intended for the government to have the ability to ensure payment of a fine or penalty, not to ensure a successful prosecution. And that's where the government goes off the rails in its analysis. The statute, the intention of the statute, the purpose of the statute is to ensure that when there is, if there is a conviction or a penalty imposed, that there'll be a means in which the monetary penalties can be satisfied. That's to be accomplished by posting of a bond or other surety. Other surety meaning other forms of financial security, like the issuance of a letter of undertaking, which is something the Coast Guard routinely accepts. The posting of cash in an agreed escrow account. Our firm has acted many times as escrow agents in similar matters, as has other counsel we've worked with served in that function. So the question really before the court at the district court level, and we believe the question before the court here at the circuit court level is, did the Coast Guard, in construing the statute, act beyond its legal authority and violate due process of our client? Our client will be out of business. The ship sat there, it sat there idle, it is sitting there idle. The cargo is sitting on board. Some way, somehow it'll come off the ship, whether by judicial option or some agreement where someone comes and takes it off. We are not in a situation where if this ship gets left behind, well, the Coast Guard exercised its authority judiciously, so what? Just one bad company out of business. Remember, the ship belongs to Angel X. It owns one asset. It has 20 some odd crew members sitting on board as its employees. And Judge Dumas looked at all these factors, and he found that there would be irreparable harm caused. And what he said was the court was going to exercise judicial oversight. How can you have irreparable harm if you're entitled to damages later? They're out of business. Entitled to damages. But who's left to pursue it? What remedy is there for the seafarers that are stuck on the ship? What remedy is it? I know we normally don't answer many questions. Yeah. We ask a lot of them. They were posed more in a rhetorical way. Here, we have an abusive discretion. The Coast Guard exceeded its legal authority. It acted unconstitutionally. And Judge Dumas stepped in and looked at the only measurable standard that the court allows for, and that's one of due process. And pursuing all these other remedies that the Coast Guard has said, well, you can do this in two years' time or three years' time. They were inadequate. They are inadequate. They provide no remedy. Because even if you were to pursue that process, they're futile. Because you go right back to the people who have already determined what they believe is appropriate and correct under the circumstances. Here, you have a situation where you have a predetermined decision awaiting you when you get to Coast Guard headquarters. And it's an adverse ruling. And under Fourth Circuit precedent, that gives us the right to come to court and seek judicial review. In closing, the bond that Judge Dumas set, set the maximum penalty the government could achieve under the Act of Substitution and Shift. He also included terms that were unobjectionable and had been agreed between the parties. And the District Court was aware of that. District Court did nothing to hamper the government's ability to prosecute the claim. In fact, there's been a robust eight-count indictment against three defendants. That was after we stayed the order. Well, in closing, I'd like to cite this panel to the government's own addendum. And they filed with their brief at a copy of the MARPOL, the Maritime Pollution Treaty. And if you look at addendum page 23, it sets out in section 7 exactly what's necessary to prosecute this record-keeping case. And it sets out the protocol for Coast Guard and other port state control authorities to onboard ships, take a copy of the oil record book, and then get it certified by the captain as a ship's record. It also goes on in the government's addendum number 25. And it talks about this conduct must be done as expeditiously as possible without causing the ship to be unduly delayed.  And then finally, I'd like to cite the court to section 1907 of the Act of Revolution from Ships itself. It sets out the Coast Guard's authority to issue subpoenas. Judge Dumas went one step further and identified the material witness statutes as a basis for which the government can obtain its witnesses to prosecute the case. So in closing, Your Honor, this case is a case that is reviewable because the Coast Guard didn't exercise its discretionary authority appropriately, misconstrued the statutes, and violated our client's due process. Thank you very much, sir. Mr. Leder? I just have several brief points. First, I think my friend, Mr. Chalice, may have misspoken when he said about the maximum amount of the possible criminal fine. As he noted, there's an indictment which lists, I believe it's three separate incidents when Cassian and Angelix violated the law. We can seek a $500,000 penalty against each of them for all three violations, so that would be at least $3 million, and under the criminal provision for fines, 18 U.S.C. 3571 C3. The court is absolutely correct in focusing on the speed mining case. Mr. Chalice, in trying to answer Judge Floyd's question, he said that the standard is provided by due process. Here, remember, we're dealing with a foreign ship that has come into U.S. waters, violated our laws, and Mr. Chalice's argument is if they post a bond that they think is appropriate or a court thinks is appropriate, they apparently, he argues, has a right to leave the United States. I'm not aware of that anywhere in the U.S. Constitution. I'm not aware of any case law that even remotely supports that type of argument. Judge King, just to add more on the point you've asked about civil criminal, for example, under the False Claims Act, the United States regularly will prosecute somebody for fraud, exactly what you said, put an individual in jail, but then there's somebody with much deeper pockets who we did not prosecute, we go after them civilly under the False Claims Act. We don't do it simultaneously, obviously, but we do it, and this is extremely common that you have both. As far as I talked about, negotiations continued. If you look at the Joint Appendix, page 318, Commander, I might pronounce the name, Spolodoro's declaration, she describes how even after the lawsuit was brought, we were continuing to negotiate on terms of a possible bond, and, in fact, continue to negotiate during the appellate proceedings. And the last point I would make is Mr. Chalice mentions the crew. Remember, the crew are not plaintiffs here. The crew haven't brought this lawsuit. We're not aware that any of the crew are claiming constitutional violence. They're certainly not doing so in this court. The crew hasn't sued anybody. This is simply Angelix bringing the suit. So you continue to negotiate after the Coast Guard Council apparently advised Judge Dumas that the Coast Guard firmly refuses to accept less than the $2.5 million bond it had previously offered? Yes, Your Honor. We continue to negotiate. As I say, during the appellate proceedings, we've continued to negotiate. Remember that the bond covers, as you all have already pointed out, a number of different other conditions could continue to negotiate. Or we could continue to negotiate. This is not, by any means, final agency action. If the court has any further questions. Well, let me ask this final question. It seems to me that you represent the Department of Justice. I'm certain you have the supervisory authority of the United States Attorney. But the United States Attorney has the right to frame the charges, which he has. On the other hand, you're also the lawyer for the Coast Guard in this case. And the Coast Guard is the one trying to get the civil penalty. Are those two things inconsistent there? They're not, Your Honor. Because if you don't mind taking my False Claims Act analogy there, it's the U.S. Attorney and the Justice Department bringing a fraud prosecution. And then when that's done, deciding should we also later pursue a False Claims Act case. And a lot of times, we may actually file them simultaneously. Most judges, at our request, will stay the civil proceedings while the criminal proceeds. So here, we would go through this criminal proceeding. It's the United States Attorney and the Environmental Division of the Justice Department co-prosecuting with assistance from the Coast Guard. If, at the end of the day, we feel it's appropriate to go for civil penalties in addition, that would be something that the Coast Guard and the Justice Department would look at. You know, obviously, it depends on is it worth the use of taxpayer resources, et cetera. But my simple point was, picking up on what Judge King had asked me, that this does happen and it's very common. Thank you, Your Honors. Thank you very much, sir. We'll come down and greet counsel and adjourn this session of court. Sine die.
judges: Robert B. King, Henry F. Floyd, Stephanie D. Thacker